IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Dorian W., ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No.: 20-cv-50322 |
| v. ) | |
| ) | Magistrate Judge Margaret J. Schneider |
| Kilolo Kijakazi, ) | |
| Commissioner of Social Security,[1] ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Dorian W., seeks review of the final decision of the Commissioner of the Social Security Administration denying his disability benefits. The parties have filed cross motions for summary judgment [26], [31]. For the reasons set forth below, the Court finds that this matter should be remanded for further proceedings consistent with this opinion.

**BACKGROUND**

**A. Procedural History**

On March 17, 2016, Dorian W. ("Plaintiff") filed for disability and disability insurance benefits and supplemental security income. [26], p. 1. These applications alleged a disability beginning on August 31, 2013. R. 1285. The Social Security Administration ("Commissioner") denied his applications on July 13, 2016, and upon reconsideration on October 11, 2016. [26], p. 1. On April 25, 2017, a hearing was held by Administrative Law Judge ("ALJ") Jessica Inouye where Plaintiff appeared and testified. *Id*. Thereafter, on May 17, 2017, the ALJ denied Plaintiff's claims. *Id*. After the Appeals Court denied review on September 5, 2017, Plaintiff appealed to the U.S. District Court for the Northern District of Illinois. *Id* at 1-2. The District Court remanded the case for a second hearing in front of ALJ Inouye which occurred on January 9, 2020. *Id* at 2. Plaintiff was represented by counsel and appeared virtually. R. 1285. Leida Woodham, an impartial vocational expert ("VE"), also appeared and testified. *Id*.

On April 23, 2020, the ALJ issued her written opinion denying Plaintiff's claims for disability, disability insurance benefits, and supplemental security income. [26], p. 2. Plaintiff appealed the decision to the Appeals Council, and the Appeals Council denied Plaintiff's request for review. R. 1-3. Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *See* 42 U.S.C. § 405(g); *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007). The parties have consented to the jurisdiction of this Court. *See* 28 U.S.C. § 636(c);

---

[1] Kilolo Kijakazi has been substituted for Andrew Saul. Fed. R. Civ. P. 25(d).

[8]. Now before the Court are Plaintiff's motion for summary judgment [26], the Commissioner's cross-motion for summary judgment and response to Plaintiff's motion for summary judgment [31], and Plaintiff's reply brief [32].

### B. The ALJ's Decision

In her ruling, the ALJ applied the statutorily required five-step analysis to determine whether Plaintiff was disabled under the Social Security Act. *See* 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of August 31, 2013 through his date last insured of March 31, 2019. R. 1288. At step two, the ALJ found that Plaintiff had the following severe impairments: degenerative disk disease of the lumbar and cervical spines, right shoulder degenerative joint disease, fibromyalgia, headaches, and carpal tunnel syndrome. *Id*. The ALJ found that these impairments significantly limited Plaintiff's ability to perform basic work activities. *Id*. At step three, the ALJ found that Plaintiff did not have an impairment or combination or impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. R. 1292-93.

Before step four, the ALJ found that Plaintiff had a residual functional capacity ("RFC") to perform sedentary work but with the following limitations: no climbing of ladders, ropes, or scaffolds; no more than occasional climbing of ramps/stairs; no more than occasional balancing, stooping, kneeling, crouching, or crawling; no more than occasional overhead reaching or frequent reaching in all other directions bilaterally; no more than frequent bilateral gross and fine manipulation of handling, fingering, and feeling; and avoid concentrated exposure to pulmonary irritants, extreme temperatures, humidity, wetness, and avoid hazards of unprotected heights and dangerous moving machinery. R. 1293. At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. R. 1312. Finally, at step five, the ALJ found that, considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, including assembler, document preparer, and call out operator. R. 1313. Therefore, the ALJ concluded that Plaintiff was not disabled under the Social Security Act at any time from August 31, 2013, through the date of decision, April 23, 2020. *Id*.

### STANDARD OF REVIEW

The reviewing court evaluates the ALJ's determination to establish whether it is supported by "substantial evidence," meaning "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Moore v. Colvin*, 743 F.3d 1118, 1120-21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Substantial evidence is "more than a mere scintilla." *Wright v. Kijakazi*, No. 20-2715, 2021 WL 3832347, at *5 (7th Cir. 2021). "Whatever the meaning of 'substantial' in other contexts, the Supreme Court has emphasized, 'the threshold for such evidentiary sufficiency is not high.'" *Id*. (quoting *Biestek v. Berryhill*, 139 S.Ct. 1148, 1153 (2019)). As such, the reviewing court takes a limited role and cannot displace the decision by reconsidering facts or evidence or by making independent credibility determinations, *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008), and "confines its review to the reasons offered by the ALJ." *Green v. Astrue*, No. 11 CV 8907, 2013 WL 709642, at *7 (N.D. Ill. Feb. 27, 2013).

The court will only reverse the decision of the ALJ "if the record compels a contrary result." *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021) (citations and quotations omitted). The court is obligated to "review the entire record, but [the court does] not replace the ALJ's judgment with [its] own by reconsidering facts, re-weighing or resolving conflicts in the evidence, or deciding questions of credibility. [The court's] review is limited also to the ALJ's rationales; [the court does] not uphold an ALJ's decision by giving it different ground to stand upon." *Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020). Additionally, an ALJ "need not specifically address every piece of evidence, but must provide a logical bridge between the evidence and his conclusions." *Bakke v. Kijakazi*, 62 F.4th 1061, 1066 (7th Cir. 2023) (citations and quotations omitted); *see also Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015).

## DISCUSSION

Plaintiff argues in his motion that the "ALJ provided an RFC that was not supported by substantial evidence" for several reasons, one of which was the ALJ's alleged failure to account for the severity of Plaintiff's migraines in the RFC limitations. [26], p. 4. The Commissioner argues that the ALJ "properly considered Plaintiff's headaches" in the RFC by providing a summary of Plaintiff's extensive medical records and outlining a timeline of the relevant migraine documentation. [31], p. 14. Accordingly, this Court examines the record to determine whether the ALJ's RFC determination was based on substantial evidence as related to the impact of Plaintiff's migraines[2] on his capacity to work.

Plaintiff is a veteran with an extensive medical history documenting multiple afflictions addressed by numerous medical providers throughout the United States. The ALJ summarized seven years' worth of medical records tracking these visits at the outset of her RFC determination. R. 1293-1304. Though some of Plaintiff's migraine records are also interspersed throughout the summary, the crux of the ALJ's migraine analysis occurs during the migraine timeline she constructed after the general summary. R. 1304. The ALJ construes the Plaintiff's medical migraine timeline as follows: Plaintiff reports migraines as an issue to a medical provider in October of 2013, but then he did not see an orthopedist or neurologist for his migraines until October 2015. *Id*. From there, Plaintiff received a "headache" evaluation through the Department of Veterans Affairs ("VA") in February 2015 where Dr. Pane "opined that these headaches would not cause problems with employment." *Id*. Plaintiff then received a CT scan for "headaches" in April of 2017 that showed no "clinical or radiological reason for the headaches." *Id*. After this,

---

[2] The ALJ characterized Plaintiff's headaches as a "severe" impairment and Plaintiff's "history of migraines" as a non-severe medically determinable impairment. R. 1288. Yet, although the ALJ provided different severity determinations for headaches versus migraines, the medical records, the RFC determination, and the parties' briefs often conflate the two conditions. As a result, it is difficult to determine what makes a record or argument relevant exclusively to "migraines" rather than "headaches," and vice versa. *See e.g.* R. 1304 (ALJ interchanging the two terms throughout the RFC discussion of migraines, using statements such as "[w]hen the claimant finally was seen again for complaints of **headaches**, it was in October 2019, when he reported worsening **migraines**…") (emphasis added). Consequently, though this Court focuses its opinion as much as possible on evidence of Plaintiff's *migraines*, meaning the "neurological disease" that has symptoms including head pain, nausea, increased sensitivity to environmental conditions, dizziness, and fatigue, the conflated use of "migraine" and "headache" throughout the record and the ALJ's decision innately necessitates some consideration of "headaches" as well. *See Migraine vs. Headache: How to Tell the Difference*, PennMedicine (Mar. 31, 2022) https://www.pennmedicine.org/updates/blogs/health-and-wellness/2019/november/migraines-vs-headaches.

Plaintiff reported a decrease in *headache* frequency in October 2017 and an increase in *migraine* frequency in October 2019. *Id*. Based on this limited timeline of treatment, the ALJ concluded that the record had an "absence of treatment notes showing him to allege this [migraines] to be a persistent problem." *Id*.

Plaintiff argues that this analysis was flawed and that the ALJ contrived inconsistencies in Plaintiff's migraine treatment and crafted gaps in Plaintiff's migraine timeline that are not consistent with the record. [26], p. 4-6. In support of this, Plaintiff argues that the ALJ mischaracterized the opinion of Dr. Pane, as well as created an inconsistency between the October 2017 report of decreased headaches and the October 2019 report of increased migraines. *Id*. Further, Plaintiff points to at least six additional medical records that he alleges disrupts the treatment gaps in the ALJ's timeline. *Id*. Finally, Plaintiff argues that the RFC is not supported by substantial evidence because it does not account for absences from work related to migraines that are supported by the record, and because the alleged migraine limitations in the RFC are not logically tethered. *Id*. Each argument will be taken in turn.

### A. Dr. Pane's Opinion

The ALJ described Dr. Pane's VA headache evaluation as concluding that "[t]hese headaches would not cause problems with employment." R. 1304. In fact, Dr. Pane concluded that Plaintiff was "[a]t least as likely as not to have frequent enough H.A. [headaches] to cause problems with employment." R. 2070. The language employed by Dr. Pane is that used by the VA to establish service connection for medical conditions in order to ultimately receive VA benefits; the VA physician need only find evidence "at least as likely as not" in order to establish disability. *See* 38 C.F.R. §§ 3.102, 4.3; U.S. Dep't of Veterans Aff., M21-1 Adjudication Proc. Manual, Part V, Subpart ii, Chapter 1 § A(1)(j) (Aug. 6, 2020), [https://perma.cc/FQD3-4YFJ] ("The ***reasonable doubt rule*** means that the evidence provided by the claimant/beneficiary (or obtained on the claimant's/beneficiary's behalf) must only persuade the decision maker that each factual matter is at least as likely as not."). This finding indicates that Dr. Pane intended to state that Plaintiff's headaches *will* impact employment by deploying the "at least as likely as not" language needed to reach the VA evidentiary standard, in stark contrast to the ALJ's assertion that Dr. Pane believed the headaches "would not cause problems with employment." R. 1304.

The Commissioner attempted to soften the ALJ's characterization of Dr. Pane's conclusion by conceding that the ALJ "[c]ould have more accurately relayed" Dr. Pane's statement, ultimately asserting that the statement really means that "[t]he evidence was equivocal about whether plaintiff's headaches would affect his ability to work." [31], p. 4, fn. 1; [31], p. 14. Even if the Commissioner is correct and Dr. Pane's statement simply relays the equivocality of headache evidence related to employment, the VA regulations state that any finding of equivocal evidence is to be resolved in the veteran's favor. *See* 38 C.F.R. § 3.102 ("When, after careful consideration of all procurable and assembled data, a reasonable doubt arises regarding service origin, the degree of disability, or any other point, such doubt will be resolved in favor of the claimant."). As such, Dr. Pane would have understood his statement of it being "at least as likely as not" that Plaintiff would have headache-related employment issues to result in a conclusion that there would be employment issues because Plaintiff would get the benefit of the VA standard. Thus, whether one starts with the ALJ's interpretation of Dr. Pane's conclusion or the Commissioner's interpretation,

the ultimate import is that Dr. Pane likely understood and intended his statement to affirmatively indicate employment issues related to headaches.

The Commissioner is correct that Dr. Pane used this language to establish Plaintiff's disability for VA purposes, and the ALJ is not bound by the disability findings of other agencies. [31], p. 4, fn. 1; 20 C.F.R. § 404.1504. However, the ALJ may consider "[a]ll of the supporting evidence underlying the other governmental agency['s] decision," meaning that Dr. Pane's opinion on employment impacts for the VA can still be considered in Plaintiff's Social Security claim. 20 C.F.R. § 404.1504. Here, the ALJ went beyond merely considering the supporting evidence underlying the VA's disability determination. She explicitly accorded "some weight" to her flawed interpretation of Dr. Pane's opinion, using the opinion to support her finding that "[t]his impairment would not preclude the claimant's ability to work." R. 1307. Thus, the mischaracterization of Dr. Pane's opinion is a flaw in the ALJ's RFC and migraine analysis.

### B. The October 2017 Report and the October 2019 Report

In rendering the RFC, the ALJ highlighted the inconsistencies in Plaintiff's description of his migraine issues in an October 2017 medical visit and an October 2019 medical visit. R. 1304. The ALJ also suggested that there was a two-year gap between Plaintiff's migraine treatment, from 2017 to 2019, and that Plaintiff's divergent characterizations of his migraines at those two visits were so inconsistent that they undermined his "allegations of disabling symptomatology." *Id*.

Plaintiff argues that the inconsistencies between the October 2017 and the October 2019 visits are "contrived", in large part because "[i]t is unclear from the November 2017 report whether his migraines have improved or merely his chronic headaches and often the record confuses issues by interchanging these terms." [26], p. 6. Plaintiff is right to note the challenges posed by the interchangeable use of the terms "migraines" and "headaches" in the record. The October 2017 visit does indeed report a decrease in "headaches" from "12-15 days out of the month" to "7-9 days per month", but the "chief complaint" for the visit is a "3 month follow up migraines [*sic*]." R. 1814-15. As a result, it is unclear if the reported decrease is truly for *headaches* as noted in the "history of present illness" section, or the *migraines* for which Plaintiff was seeing the physician in the first place. *Id*. Thus, it is difficult to say with certainty that this October 2017 visit reporting decreased headaches is inconsistent with the October 2019 visit reporting that Plaintiff's "BIGGEST issue is worsening migraines last several years [*sic*]... 15-20 days a month." *Compare* R. 1814-15 *with* R. 2004.

Even assuming that the October 2017 visit incorrectly relayed deceasing headaches instead of decreasing migraines, the two October visits do not necessarily have to be in conflict about Plaintiff's migraine issues because, as Plaintiff points out, "[i]nconsistencies in an individual's statements made at varying times does not necessarily mean they are inaccurate... [s]ymptoms may vary in their intensity... or may worsen or improve with time. This may explain why an individual's statements vary when describing the intensity... of symptoms." [26], p. 7; SSR 16-3p. Though there may be some variance in terms of the number of days per month Plaintiff reported having migraines or the severity of the migraines, Plaintiff still consistently reported migraine issues to his physicians from at least 2013 onwards. *See* R. 338, 348, 399, 479, 547-550, 599, 610, 878, 884, 1071, 1108, 1739, 1759, 1782, 1785, 1805, 1811, 1814, 1890, 1908, 1917, 1919, 1935,

1942, 1952, 1953, 1972, 2004, 2067, 2078, 2099, 2125-26, 2130-31, 2170-72, 2190, 2203. Further, Plaintiff did not have a 2-year treatment gap between the October 2017 visit and the October 2019 visit; the record reflects at least twelve separate medical visits with at least eight different physicians between October 2017 through October 2019[3] where his migraine issues were discussed. R. 1840, 1890, 1891, 1908, 1917, 1919, 1935, 1952, 1942, 1953, 2125-26, 1972, 2130-31. The ALJ's claim that after the October 2017 visit, Plaintiff "[f]inally was seen again for complaints of headaches… in October 2019" is not supported by substantial evidence. R. 1304.

Although the specifics of Plaintiff's migraine reports to his physicians may vary over the years, the overall consistency in Plaintiff reporting ongoing migraine issues overrides those variances. As such, the limited inconsistency between the October 2017 report and the October 2019 report (which is still only an inconsistency when assuming both reports are indeed intended to discuss *migraines* as opposed to *headaches*) has little import when compared with the overall consistency of Plaintiff's migraine records, which demonstrate continued migraine treatment from 2013 onwards. Further, "[t]he ALJ simply cannot recite only the evidence that is supportive of her ultimate conclusion without acknowledging and addressing the significant contrary evidence in the record." *Moore v. Colvin*, 743 F.3d 1118, 1124 (7th Cir. 2014). *See also Denton v. Astrue,* 596 F.3d 419, 425 (7th Cir. 2010) (While an ALJ need not mention every piece of evidence in the record, he "has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding."). The ALJ did not support her opinion with substantial evidence by reviewing only a select set of medical records to support her contention that Plaintiff was not seeking ongoing migraine treatment when numerous other records existed corroborating Plaintiff's allegations of chronic migraines.

### C. The ALJ's Alleged Gaps in Migraine Treatment

Despite providing a lengthy summary of Plaintiff's complex medical history that relayed numerous treatment notes regarding his migraines, the ALJ ultimately concluded that Plaintiff had an "[a]bsence of treatment notes showing him to allege this [migraines] to be a persistent problem" after reviewing his migraine evidence separately. R. 1293-1303, 1304. In the migraine-specific review of Plaintiff's records, the ALJ suggests that Plaintiff had significant gaps in his migraine treatment—one gap allegedly from October 2013 through October 2015, another from October 2015 through April 2017, and the final one from October 2017 to October 2019 that was discussed in Section B of this opinion. R. 1304. Plaintiff contests these gaps and points to at least six records that demonstrate Plaintiff was actively seeking medical treatment for his migraines during these timeframes. [26], p. 5-6.

---

[3] Although some of these medical visits occurred after Plaintiff's date last insured ("DLI") of March 31, 2019, "[e]vidence generated after the claimant's date last insured may be relevant… to the extent it reflects her condition and ability to work before her date last insured." *Leskowyak v. Kijakazi*, No. 22-1777, 2023 WL 355103, at *2 (7th Cir. Jan. 23, 2023). The additional medical records generated after March 31, 2019 clearly go towards Plaintiff's migraines and their impact on his capacity to work as they describe the limitations of his condition. Further, the ALJ herself relied upon some of the post-DLI records to render the RFC, demonstrating their relevancy and placing those records directly at issue in her decision (i.e. contrasting the October 2017 and the October 2019 visits, the latter of which occurred post-DLI). R.1304.

Plaintiff's reference to the six additional records is just the tip of the iceberg; there are at least eight records from the October 2013 through the October 2015 window alone[4] that contest the ALJ's contention that Plaintiff "[d]id not report these [migraines] as major issues in subsequent progress notes" during that timeframe. R. 1304; R. 348-353, 429, 479, 878, 884, 2067, 2078, 2099. In fact, the ALJ contradicts her own assertion that Plaintiff "[d]id not report these [migraines] as major issues in subsequent progress notes" from October 2013 through October 2015 in her general summary of Plaintiff's medical records; for example, the ALJ pointed out that Plaintiff visited Dr. Pane on December 9, 2014 for "[m]any chronic medical problems, including chronic pain and headaches." R. 1296.

More concerning than the inherent contradiction between the ALJ's general treatment summary and her analysis of the migraine records is the total absence of a myriad of migraine records from any parts of the RFC discussion. The ALJ cites roughly 15 medical interactions where Plaintiff discussed migraine issues with providers, but the record reveals at least 40 additional migraine interactions, some with significant implications for Plaintiff's work capacity ("he indicates having about 15-20 days a month where he is entirely dysfunctional"), that were not acknowledged by the ALJ. R. 1972; R. 338, 348-353, 399, 429, 479, 547-550,595, 599, 610, 878, 884, 964, 1071, 1108, 1599,1654, 1721, 1739,1741, 1745, 1747, 1754, 1759, 1782, 1785, 1794, 1795, 1801, 1805, 1811, 1814, 1840, 1890, 1891, 1908, 1917, 1919, 1935, 1942, 1952, 1953, 1972, 2004, 2067, 2078, 2099, 2125-26, 2130-31, 2170-72, 2190, 2203. While the ALJ is not required to examine "[e]very piece of evidence in the record", the ALJ cannot ignore "an entire line of evidence" or "overlook entire swaths of [evidence]." *Reinaas v. Saul*, 953 F.3d 461, 466-67 (7th Cir. 2020). Ultimately, "[a]n ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.'" *Baldwin v. Berryhill*, 746 Fed. Appx. 580, 583 (7th Cir. 2018) (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)). Because the ALJ only reviewed a fraction of Plaintiff's migraine records, and used those limited records to cast gaps in Plaintiff's migraine treatment that are simply unsupported by the rest of the record, the ALJ's RFC cannot be said to be supported by substantial evidence.

### D. Lack of RFC Limitation Relating to Absences from Work

The ALJ provided an RFC of sedentary work with additional limitations and suggested she included headache considerations by having Plaintiff "avoid environments that could exacerbate symptoms or pose a danger to be around." R. 1306. Plaintiff argues the ALJ did not "build an accurate and logical bridge between the evidence and her conclusions because the ALJ's restrictions are untethered to any evidence and unresponsive to prostrating migraine attacks." [26], p. 5. Though the ALJ clearly stated that she did include some migraine limitations in the RFC— she wrote that "[g]iven his history of headaches and complaints of side effects from the medications, he would have to avoid environments that could exacerbate symptoms or pose a danger for him to be around"—the ALJ did not explicitly articulate *which* RFC limitations were intended to account for Plaintiff's migraines. Although "[i]t is possible to postulate which [RFC

---

[4] In addition, there are four additional visits during the October 2015 through April 2017 window that are unacknowledged, as well as the twelve visits during the October 2017 through October 2019 timeframe discussed in Part B of this opinion. *See* R. 964, 1071, 338, 1108; R. 1840, 1890, 1891, 1908, 1917, 1919, 1935, 1952, 1942, 1953, 2125-26, 1972, 2130-31.

limitations] were related to migraines as opposed to the other severe or non-severe impairments… the reviewing court should not have to speculate as to the basis for the RFC limitations." *Moore v. Colvin*, 743 F.3d 1118, 1127-1128 (7th Cir. 2014). In other words, the RFC limitations alleged to be accounting for migraines should be clearly designated and the relevancy of those limitations should be tethered to the migraine evidence in the record. The RFC as it currently stands is thus insufficient.

Plaintiff also cites to *Moore v. Colvin* and argues that the RFC is even further undermined because the "ALJ's decision did not reflect any likelihood of absences or breaks at work related to migraines, and that is simply unsupported by the record." [26], p. 5 (quoting *Moore,* 743 F.3d at 1127). Plaintiff testified at the 2020 hearing that he has migraines up to "five to six [days] a week" that "bring on, nausea, extreme pain, a lot of times like vomit" or that "put me in bed sick for hours on end at least six hours." R. 1331. Plaintiff explained the impact these migraines have on his work, reporting that he "would just randomly get a migraine sometimes and have to leave work," as well as instances when he could not even go to work in the first place because of migraines. R. 1352. Further, Plaintiff's testimony about the impact of his migraines on his work attendance is corroborated by the letter written by his former boss, Nicole Ellis.[5] Ms. Ellis reported that Plaintiff often had to miss work or leave work early due to his medical conditions, relaying at least two instances that she could recall Plaintiff specifically missed work for migraines during the five-month period he worked for her. R. 355-56. Additionally, Plaintiff's absence testimony is corroborated by treatment notes from medical providers. As discussed in Part A of this opinion, Dr. Pane affirmatively indicated in his VA assessment that Plaintiff's migraines would cause problems with employment, and Dr. Meyer recorded in a June 2019 visit that Plaintiff reported "too many missed work days [*sic*]" and an "inability to work on reg basis [*sic*]." R. 429, 1952. The VE testified at the 2020 hearing that the absenteeism tolerance for employment at Plaintiff's RFC level would be 6 to 8 days per year. R. 1366. In response, Plaintiff's attorney reiterated that Plaintiff "[w]ould miss more than 68 days per year… just based on his appointments alone it well exceeds that and we're talking about the migraines…", clearly bringing to the ALJ's attention the likelihood of Plaintiff missing work for migraines. R. 1368.

In light of the absenteeism evidence, the ALJ erred in "[n]ot reflect[ing] any likelihood of absences or breaks at work related to migraines," which "is simply unsupported by the record." *Moore*, 743 F.3d at 1127-28. Plaintiff testified at his hearing that migraines were impacting his work attendance, and that testimony was corroborated by medical sources as well as a former employer. As such, the possibility of Plaintiff's chronic absenteeism was squarely before the ALJ; even if the ALJ did not credit the likelihood of Plaintiff's absenteeism, she still "[m]ust explain her reasoning, building a so-called "logical bridge" that connects the evidence and her decision." *Smith v. Astrue*, 467 Fed. Appx. 507, 510 (7th Cir. 2012).

---

[5] It should be noted that the ALJ was already remanded once by then Magistrate Judge Iain D. Johnston for (among other things) incorrectly rejecting Ms. Ellis' letter simply because it was not a medical source and was directed on remand to "[r]e-visit [Ms. Ellis' letter] to ensure that [it is] fully explored and analyzed" because an ALJ must "[c]onsider not only information from doctors but also from "other persons," including "family and friends"." *See* R. 1386-88 (citing SSR 16-3p). Yet, the ALJ again did not consider the import of Ms. Ellis' letter as directed and instead again rejected the letter because it is a non-medical source. *See* R. 1309 ("This opinion is given no weight. Ms. Ellis is not an acceptable medical source"). Accordingly, on remand the ALJ is directed to consider the import of Ms. Ellis' letter, not as a medical opinion, but as a piece of SSR 16-3p evidence corroborating Plaintiff's testimony about absenteeism.

Consequently, because the ALJ did not discuss the likelihood of Plaintiff's absenteeism due to migraines at all despite evidence that absenteeism would be an issue for Plaintiff, the RFC cannot be said to be supported by substantial evidence. This error cannot be deemed harmless because the VE testified that the absenteeism tolerance for jobs at Plaintiff's RFC level was only six to eight days per year, and there is evidence suggesting that Plaintiff would be unable to maintain the specified jobs for this reason. Ultimately, the lack of absenteeism discussion in the RFC "[c]annot be deemed harmless because we cannot say "with great confidence" that the result would be the same on remand." *Smith* at 511. Accordingly, this case is remanded to address the likelihood of unsustainable absenteeism due to migraines, as well as to fully consider the weight of the migraine evidence in crafting the RFC.

## CONCLUSION

In light of the foregoing discussion, the Court need not consider Plaintiff's other arguments relating to substantial evidence. This matter is remanded for further proceedings consistent with this opinion.

Date: 09/28/2023         ENTER:

_Margaret J. Schneider_
United States Magistrate Judge